# In the United States Court of Federal Claims

**No. 26-718C**
**Filed: September 14, 2026**
**Redacted Version Issued for Publication: October 3, 2026**[1]

* * * * * * * * * * * * * * * * * * *

**22ND CENTURY NETWORKS, INC.,**

**Protestor,**

**v.**

**UNITED STATES,**

**Defendant,**

**v.**

**BY LIGHT PROFESSIONAL IT SERVICES, LLC,**

**Defendant-Intervenor.**

* * * * * * * * * * * * * * * * * * *

**W. Brad English,** Maynard Nexsen PC, Huntsville, AL, for protestor. With him were **Hunter M. Drake, Emily J. Chancey**, **Kristopher B. Womack**, and **Taylor R. Holt,** Maynard Nexsen PC, Huntsville, AL.

**Ioana C. Meyer**, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With her were **Douglas K. Mickle**, Acting Deputy Director, Commercial Litigation Branch, **Patricia M. McCarthy**, Director, Commercial Litigation Branch, and **Brett A. Shumate**, Assistant Attorney General, Civil Division. Of counsel **Susan Chagrin**, Associate General Counsel, Defense Information Systems Agency, Washington, DC.

**Damien Specht,** Morrison Foerster LLP, Washington, DC, for intervenor. With him were **Brian E. Doll, Jr.**, **James Tucker**, and **Jillian I. Stern,** Morrison Foerster LLP, Washington, DC, of counsel.

---

[1] This Opinion was issued under seal on September 13, 2026. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

# O P I N I O N

**HORN, J.**

Protestor, 22nd Century Networks, Inc. (22nd Century), filed the current post-award bid protest, Case No. 26-718C, in the United States Court of Federal Claims challenging the decision of the Defense Information Systems Agency (DISA) to award a contract to intervenor, By Light Professional IT Services LLC (By Light) in response to Request for Proposals (RFP) No. HC108426R0005 (the Solicitation). Protestor alleges that the DISA required the offerors to use Menlo Security, Inc.'s (Menlo) service agreements and licenses, and because Menlo quoted By Light a lower price than protestor, and By Light was awarded the contract, "DISA did not ensure that this procurement was conducted fairly."

## FINDINGS OF FACT

In DISA's Combined Acquisition Strategy/Acquisition Plan, the agency explained:

> DISA requires a secure browser isolation solution to be delivered as a managed service for the purpose of providing all Department of War (DoW) users with safe and reliable access to web resources. The solution and managed service provider (MSP) is critical to mitigating cyber threats, enhancing information system security, and eliminating vulnerabilities in critical infrastructure that adversaries could exploit. The DoW allocates significant resources, tens of millions of dollars annually, to defend its networks against internet-based threats. Notably, approximately 36% of these threats originate from browser-based attacks. To address this challenge, the DoW has adopted the Cloud-Based Internet Isolation (CBII) service, leveraging Menlo Security Inc.'s Cloud Browser (MSCB) isolation capability. Delivered as a managed service by a primary integrator, this solution currently protects approximately 3.05 million DoW users. Based on a successful Other Transaction Authority (OTA) agreement, the DoW has selected MSCB as the solution for CBII. A brand-name Justification for other than Full and Open Competition (OTFAOC) has been executed to substantiate this decision.
>
> The purpose of this FAR-based follow-on contract action is to procure Menlo Security Inc.'s MSCB, the proprietary, commercial off-the-shelf (COTS) brand-name product, as a managed service, providing the DoW's remote browsing isolation (RBI) solution for CBII.

The Combined Acquisition Strategy/Acquisition Plan continued:

> Since 2020, DoW has leveraged the MSCB solution via the production OTA agreement to protect DoW users from evolving cyber threats. This five-year deployment has continually adapted to mitigate increasingly sophisticated malicious tactics, techniques, and procedures. The MSCB provides

> significant value by transforming DoW's web browsing experience, resulting in a safer, more efficient, and more resilient operation. By supporting major browsers (Google Chrome, Microsoft Edge, Mozilla Firefox, and Apple Safari), the MSCB offers increased flexibility, allowing organizations to leverage existing infrastructure, reduce training costs, and improve user productivity. The MSCB significantly enhances DoW's security posture by masking user browsing activity, hindering intelligence gathering by threat actors. It provides robust, multi-layered protection against web-based threats by isolating online plug-ins and screening downloads, preventing malicious code from compromising DoW computers and networks. It also blocks access to known malicious websites and restricts access to inappropriate content, improving compliance and minimizing distractions.

The Combined Acquisition Strategy/Acquisition Plan explained:

> Menlo Security, Inc. products have been crucial to DISA's mission, protecting millions of DoW users across major organizations, including the Office of the Secretary of War and the Defense Logistics Agency. As the DoW's remote browsing isolation solution for five years, the MSCB has prevented billions of cyber threats, offloaded hundreds of petabytes of data, and improved responsiveness. From January to March 2025, the system detected and mitigated an average 25 million threats monthly and offloaded over 4 petabytes of data each month, reinforcing its critical role in defending the DoW in cyberspace.
>
> The CBII solution requires continuous operation within a secure, FedRAMP+ Level 2 compliant, unclassified Cloud Service Offering to protect DoW networks from online threats. This environment, supporting up to 3.4 million DoW users worldwide with 24/7 secure internet browsing, threat isolation, and bandwidth freeing, is already powered by Menlo Security, Inc. This follow-on effort focuses on maintaining and enhancing this system by continuing to utilize Menlo Security, Inc.'s cloud environment and adding smart, automated defenses (using artificial intelligence and machine learning (AI/ML)) to proactively block cyberattacks, ensuring a strong and reliable defense against web-based threats.

For cost, the Combined Acquisition Strategy/Acquisition Plan included the following table:

| Period | Estimated PoP | Estimated Cost |
|---|---|---|
| Base Year | April 15, 2026 – April 14, 2027 | $53,686,476 |
| Option Year 1 | April 15, 2027 – April 14, 2028 | $54,759,906 |
| Option Year 2 | April 15, 2028 – April 14, 2029 | $55,854,804 |
| Option Year 3 | April 15, 2029 – April 14, 2030 | $56,971,600 |
| Option Year 4 | April 15, 2030 – April 14, 2031 | $58,110,732 |
| Surge (5%) | April 15, 2026 – April 14, 2031 | $13,969,175 |
| FAR 52.217-8 | April 15, 2031 – October 14, 2031 | $29,062,866 |
| Life Cycle | April 15, 2026 – October 14, 2031 | $322,415,559 |

The Combined Acquisition Strategy/Acquisition Plan explained the "estimated cost was determined through: **Market research:** Conducted in collaboration with the original equipment manufacturer (OEM), Menlo Security, Inc., to gather information on the current market prices and trends," and "**Review of current agreements:** Analysis of existing contracts, including the existing OTA agreement HC10842090006 awarded by DISA, to determine the pricing structure and any discounts or terms that may be applicable." (capitalization and emphasis in original).

The Performance Work Statement for the Solicitation currently under review reflected that:

> The scope of this contract requires a managed service for the Government that provides a cloud environment utilizing MSCB [Menlo Security Inc.'s Cloud Browser]. This solution includes all hardware, software, and infrastructure components required to deliver to the Government a secured, flexible, cloud environment that is readily available, scalable, globally accessible, and provides enhanced cyber security protections in an isolated, secured cloud environment. Capabilities within the MSCB-engineered CBII platform will include but are not limited to destination-based whitelisting and blacklisting, web content filtering, site categorization and risk assessment, malware scanning and sandboxing, data loss prevention and web isolation within a secure container. The managed service, an essential requirement of the contract, will provide managed services to include program support, a tiered service desk infrastructure, engineering, migration support, user and administrator training, and accreditation & authorization (A&A) support. The Government may require surge support during the base or any option period, and surge modifications will be within the scope of the contract and provide increased support for the defined task areas of this PWS. Surge support over the life of the contract will not exceed 5% of the contractor's total proposed cost/price for the base and all option periods, excluding any six-month extension of services pursuant to FAR 52.217-8.

(alteration added). The Performance Work Statement for the Solicitation identified seven "Performance Requirements" for the contractor to meet:

> Task 1 – Program Support
> Task 2 – Unclassified/NIPRNET [Non-classified Internet Protocol (IP) Router Network Net] Production Environment (engineered by Menlo Security, Inc.)
> Task 3 – Operational Service Support
> Task 4 – Accreditation & Authorization (A&A)
> Task 5 – Migration, Readiness Assessments, and Sustainment Support
> Task 6 – Training
> Task 7 – Engineering Support Services

(alteration added). The Solicitation "Basis for Contract Award" explained:

> Award will be made to the responsible offeror whose proposal is determined to represent the overall best value to the Government using a lowest price technically acceptable (LPTA) evaluation process. The Government anticipates awarding to the lowest price technically acceptable respondent from initial contractor responses, without engaging in exchanges with respondents. Respondents are strongly encouraged to submit their best technical solution and price/cost in response to this solicitation. The technical proposal should include all information the offeror wants the Government to consider and evaluate regarding its ability to perform all work described in the evaluation subfactors. To be eligible for award, the offeror's proposal must sufficiently address all aspects of the evaluation factors and subfactors. Failure to comply with the terms and conditions of the solicitation may result in the offeror being ineligible for award.

The Solicitation informed offerors that

> [t]he Government intends to evaluate proposals and award a contract without exchanges. However, the Government reserves the right to conduct exchanges or seek clarifications if the KO [Contracting Officer] determines they are necessary. In the event issues pertaining to the solicitation cannot be resolved to the KO's satisfaction, the Government reserves the right to cancel the solicitation. In such event, offerors will be notified in writing.

(alterations added). The Solicitation had two evaluation factors: Factor 1, "Technical/Management Approach," and Factor 2, "Price." Factor 1 had four subfactors: "Subfactor 1: Core Service Capability & Performance," Subfactor 2: Tier II: Contractor Provided Infrastructure Support," "Subfactor 3: Cybersecurity, A&A, Threat Mitigation, Data Protection, and ICAM [Identity, Credential, and Access Management] Interoperability," "Subfactor 4: Engineering and Mobility Support." (alteration added). According to the Solicitation: "The Technical/Management subfactors will be evaluated and rated either Acceptable or Unacceptable. In order for a proposal to be rated overall Technically Acceptable, each of the subfactors must be rated Acceptable." The description for "Acceptable" was: "Proposal clearly meets the minimum requirements of the

solicitation," and the description for "Unacceptable" was: "Proposal does not clearly meet the minimum requirements of the solicitation." For "Factor 2: Price," the Solicitation stated:

> The Offeror's firm-fixed price proposal will be evaluated for award purposes based upon the total evaluated price which consists of the offeror's proposed prices for the base period, all option periods, including option pricing for an additional 6-month period that may be authorized IAW [in accordance with] FAR 52.217-8, and surge pricing. Evaluation of the options shall not obligate the Government to exercise such options. The offeror's price proposal will be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete. Normally, price reasonableness is established through cost and price analysis techniques as described in FAR 15.404. For a price to be complete, all solicitation requirements must be priced, figures correctly calculated and prices presented in in a clear and useful format. The Government reserves the right, but is not obligated, to conduct a realism analysis.

(alteration added). The initial Independent Government Cost Estimate (IGCE) for the procurement was $322,415,559.02.

In response to the Solicitation, four offerors submitted proposals on March 23, 2026: Protestor, 22nd Century, intervenor By Light, [redacted], and [redacted]. By Light proposed a price of $[redacted], [redacted] proposed a price of $[redacted], 22nd Century proposed a price of $[redacted], and [redacted] proposed a price of $[redacted]. After DISA issued Amendment 0004 to the Solicitation, all four offerors subsequently submitted revised price proposals on March 30, 2026: By Light's revised price was $[redacted], 22nd Century's revised price was $[redacted], [redacted] revised price was $[redacted], and [redacted] revised price was $[redacted].

DISA's April 10, 2026 Memorandum for Record, titled: Independent Government Cost Estimate (IGCE) Increase After Release of Request for Proposal (RFP)," explained that

> The Defense Information Systems Agency (DISA) Program Executive Office Cyber (ID)/Internet Protection Branch (ID51) submitted their complete requirements package on January 12, 2026, including an IGCE of $322,415,559. The CBII RFP was posted to SAM.gov on February 23, 2026.
>
> Initial proposals received on March 23, 2026, were priced significantly higher than the IGCE. The Government determined this was due to the usage-based pricing model in the RFP. In response, the Government issued RFP Amendment 0004 to replace the usage-based model with enterprise-based pricing. Four revised proposals were received on March 30, 2026, with pricing more comparable to the IGCE.

> After receipt of the revised proposals, DISA ID51 discovered that its original IGCE was based on historical pricing from the current contract, Other Transaction Agreement (OTA) HC10842090006, but it had failed to account for a recent cost increase in the current OTA extension and price increase related to managed services versus an annual subscription. To correct this, a revised IGCE was submitted in the amount of $340,040,271. Based upon the information documented above, this MFR supports the IGCE increase, and no further documentation is required.

(capitalization in original). The same day, April 10, 2026, DISA issued Amendment 0006 to the Solicitation "to issue evaluation notices (ENs)" and to "request Final Proposal Revisions (FPRs)." In the evaluation notices to all four offerors, DISA asked that each offeror "review their proposal submission, provide justification and documentation to support proposed pricing, and/or submit a revised proposal reducing the proposed price." On April 20, 2026, all four offerors submitted final revised proposals, including revised price proposals. In defendant's submission to the court, defendant provided the following chart reflecting the offerors' final evaluated prices:

| Offeror | Total Evaluated Contract Price | Price for Base Year CBII Managed Service | Price for Base Year CBII HEAT Shield Managed Service |
|---|---|---|---|
| **By Light** | $344,654,988.32 | $[redacted] | $[redacted] |
| **22nd Century** | $[redacted] | $[redacted] | $[redacted] |
| [redacted] | $[redacted] | $[redacted] | $[redacted] |
| [redacted] | $[redacted] | $[redacted] | $[redacted] |

The revised IGCE for the procurement was $340,040,271.

In the April 27, 2026 Source Selection Decision Document, the Source Selection Authority explained: "After initial evaluation of the offerors, the Government conducted discussions with all offerors and requested Final Proposal Revisions (FPRs) from the four offerors," and the Source Selection Evaluation Team "determined all offerors were technically acceptable with conclusion of the oral proposal presentations." Regarding Price, the Source Selection Authority explained:

> All offerors' prices were evaluated and determined to be complete and reasonable. The Contracting Officer determined that price competition existed and I concur. Price realism analysis was not performed. The price evaluation was based on the TEPs [Total Evaluated Prices] compared to the IGCE and proposed average price for the projected 5-year contract life (one-year base period and four, 1-year options). The TEP consisted of the offeror's proposed prices for the base period, all option periods, and option pricing for an additional 6-month extension period that may be authorized IAW FAR 52.217-8.

(alteration added). The April 27, 2026 Source Selection Decision Document included the following price chart:

| Offeror | Proposed April 20, 2026 | Delta from IGCE | Delta from Average TEP [Total Evaluated Price] |
|---|---|---|---|
| By Light | $344,654,988.32 | [redacted]% | [redacted]% |
| TSCNI[2] | $[redacted] | [redacted]% | [redacted]% |
| [redacted] | $[redacted] | [redacted]% | [redacted]% |
| [redacted] | $[redacted] | [redacted]% | [redacted]% |
| IGCE | $[redacted] | | |
| Proposed Price Average | $[redacted] | | |

(footnote and alteration added). The April 27, 2026 Source Selection Decision Document explained:

> By Light's TEP is $344,654,988.32, which is the lowest of the four offerors. By Light is [redacted]% lower than the next lowest offeror, and [redacted]% lower than the average total proposed prices of all offerors, which is $[redacted]. Further, the TEP compares favorably to the IGCE and is [redacted]% higher than the IGCE amount of $[redacted] (including six-month extension). Although higher, By Light's TEP is still within a reasonable range of the IGCE. A reasonable range is considered to be within 1 standard deviation. In a normal distribution, 1 standard deviation will include the data that is within [redacted]% of the average. By Light is considered reasonable in comparison to the IGCE.

Therefore, the Source Selection Authority concluded: "Although no competitive range was determined to exclude any offerors, the evaluation of offerors, after receipt of FPRs, clearly shows By Light is the LPTA [Lowest Price Technically Acceptable] offeror. Accordingly, I direct the Contracting Officer to award the CBII contract to By Light." (alteration added).

After DISA's decision to award the contract to By Light, protestor filed its bid protest complaint on May 14, 2026. Subsequently, on June 15, 2026, protestor filed an amended complaint.[3] Protestor's amended complaint contains a single count: "Count One - DISA

---

[2] TSCNI refers to protestor "22nd Century Technologies Inc."

[3] In protestor's original complaint, protestor indicated no actual knowledge that Menlo had offered By Light a different price than protestor and alleged:

> Because By Light's price was substantially lower than the baseline price, DISA knew or should have known that it either did not propose to provide all required licenses, did not follow the pricing instructions by removing or manipulating the plug amounts for surge and pricing, or both. DISA should have found By Light Unacceptable because its proposal did not price all the Solicitation's requirements. Alternatively, DISA should have removed By Light from the competition because it failed to follow the Solicitation's pricing

did not ensure that this procurement was conducted fairly." Protestor made the following allegations and arguments:

> DISA essentially abdicated its source selection decision in this LPTA procurement to its mandatory subcontractor, Menlo. And, in doing so, frustrated the Source Selection Plan by allowing Menlo's charges to each bidder—not the contractor-provided services—to become the competitive difference. Among technically acceptable bidders, DISA knew price would be the deciding factor and that Menlo's charges would make up the vast majority of offerors' pricing. Indeed, DISA estimated Menlo's charges were nearly [redacted]% of the cost in the base year of both of its IGCEs. DISA was in contact with Menlo during the acquisition process, working cooperatively to develop the IGCE. But DISA did nothing to ensure Menlo—the de facto source selection authority – treated offerors fairly.
>
> In fact, Menlo did not treat the offerors fairly or impartially. Menlo charged the other bidders $[redacted] for 5.5 years of CBII Managed Services and Heat Shield. DISA knew or should have known that by looking at [redacted] proposal. Similarly, it DISA knew or should have known by looking at By Light's proposal and doing the math mentioned above, that Menlo charged By Light no more than $[redacted] for the same thing, a difference of $[redacted]. Even worse, Menlo lied to the other offerors, or at least 22nd Century, saying it could not negotiate its charges because it wanted to maintain a competitive process that was focused on technical acceptability.

(footnote and internal references omitted). In protestor's amended complaint, protestor proports to calculate Menlo's charges to By Light as follows:

> By Light's total price for CBII Managed Services was $[redacted] and its total price for Heat Shield was $[redacted], a grand total of $329,665,229.64. However, By Light's proposal also included its [redacted], which were included in those CLIN prices. Adding those [redacted] shows that By Light's [redacted] were $[redacted]. Adding [redacted]% of By Light's [redacted], or $[redacted] and subtracting that total from By Light's total [redacted] shows that Menlo charged By Light no more than $[redacted], without accounting for [redacted].

(footnote and internal references omitted). Protestor also alleges:

> As expected, Menlo's charges to offerors were the deciding factor. All bidders were technically acceptable, so the award decision came down to the lowest price. By Light had the lowest price because Menlo offered it substantially lower charges than it offered the other bidders. In essence,

---

> requirements or otherwise manipulated them. In either event, as the Acceptable bidder with the second lowest price, 22nd Century would have received award.

> there was no competition. Because Menlo controlled the outcome and gave By Light a sweetheart deal on the licenses that made up the majority of the proposed price, every other technically acceptable bidder was fighting for second place from the outset. Not only did this violate the Source Selection Plan's intention to allow the contractor services to be the competition's focus, but it eliminated all competition to start with.

In protestor's motion for judgment on the Administrative Record, protestor reiterates that "[b]y making Menlo a 'required subcontractor' and failing to establish guardrails or provide oversight to ensure it treated all bidders fairly, DISA essentially ceded source selection authority to Menlo and violated principals of fundamental fairness." (alteration added). Protestor also argues that "[b]y unreasonably allowing Menlo to deceive bidders and manipulate this competition, DISA prejudice 22nd Century." (alteration added).

In response to protestor's motion for judgment on the Administrative Record, defendant and intervenor both filed motions to dismiss protestor's amended complaint, and, in the alterative, cross-motions for judgment on the Administrative Record. Defendant argues in its motion to dismiss that "by contesting the pricing, 22nd Century is merely mounting a challenge to the terms of the solicitation—a challenge that 22nd Century has waived by failing to raise it before bidding closed." In intervenor's motion to dismiss, intervenor argues that a "protest is not a vehicle for a disappointed offeror to complain that a vendor quoted a lower price to another offeror than to it. Yet that is exactly what 22nd Century's protest does: it complains that its proposed supplier, Menlo Security, Inc. ('Menlo'), quoted By Light a lower net price than it quoted 22nd Century."

In defendant's cross-motion for judgment on the Administrative Record, defendant argues that "the record does not show that DISA treated offerors unfairly or ceded control of the procurement to Menlo. DISA established the same solicitation requirements for all offerors, allowed offerors to negotiate with Menlo, evaluated all proposals under the same criteria, and made the final award decision itself." In intervenor's cross-motion for judgment on the Administrative Record, intervenor argues that "the record demonstrates the Agency evaluated proposals and awarded the contract in a reasonable manner, in strict accordance with the LPTA terms of the Solicitation. 22nd Century fails to identify any Agency error in the evaluation and award process."

In its response to the motions to dismiss, protestor argues that its post-award bid protest "is not a solicitation protest but a timely challenge to DISA's unreasonable conduct," and "nothing in the Solicitation indicated that DISA planned to cede source selection authority to its mandatory subcontractor by allowing it to pick the winner simply by offering different prices for required products." In response to the cross-motions for judgment on the Administrative Record, protestor contends:

> While it may be true that DISA made the award, Menlo certainly picked the winner. DISA made Menlo a mandatory subcontractor, knowing its costs would make up nearly [redacted]% of the proposed price. Yet DISA did

> nothing to ensure Menlo treated bidders fairly. That meant Menlo had the unimpeded ability to pick the winner in this LPTA procurement by giving it a better deal than the other bidders. Nobody disputes that is what happened here. DISA's award decision was a predetermined formality once Menlo gave By Light a substantially better deal than everyone else.

Defendant's reply brief argues that "[i]n its response, 22nd Century still fails to demonstrate that the Defense Information Systems Agency (DISA) conducted an irrational procurement," which intervenor echoes by contending "Plaintiff fails to establish any error in the evaluation or award decision." (alteration added).

After the parties' motions were fully briefed, the court held oral argument. At oral argument defendant counsel argued that "there's nothing in the record that would show that the contracting officer knew" that Menlo did not offer the same prices to each offeror, and, after conferring with the contracting officer, represented that the agency "did not know that there were different prices charged by Menlo."

Protestor also filed a motion to supplement the Administrative Record, which defendant and intervenor oppose, and which is discussed below.

## DISCUSSION

Initially, defendant and intervenor both argue that protestor has waived its ability to bring a bid protest challenge in its court. Defendant argues that "[t]he Court should dismiss this complaint for failure to state a claim because 22nd Century waived its objection to the terms of the Solicitation," (alteration added), and intervenor argues the court should dismiss plaintiff's protest "as an untimely Solicitation challenge that Plaintiff waived under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007)." In Blue & Gold, the United States Court of Appeals for the Federal Circuit addressed whether if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. The United States Court of Appeals for the Federal Circuit noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the agency had made a contract award. See id. at 1311. When considering if the protestor had waited too long to challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Trillion ERP Venture Tech LLC v. United States, 161 Fed. Cl. 531, 542 (2022). In Blue & Gold, the United States Court of Appeals for the Federal Circuit held:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of

> the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (alteration in original); see also Oak Grove Techs., LLC v. United States, 116 F.4th 1364, 1378 (Fed. Cir. 2024) ("The applicability of the 'Blue & Gold rule' turns on the existence of a patent error."); M.R. Pittman Grp. v. United States, 68 F.4th 1275, 1283 (Fed. Cir. 2023) ("Blue & Gold requires that a party with the opportunity to object to the terms of a government solicitation containing a patent error must do so prior to the close of the bidding process or else it waives its ability to raise that objection in the Court of Federal Claims." (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313)); Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1380 (Fed. Cir. 2022) (citing Harmonia Holdings Grp. v. United States, 20 F.4th 759, 766 (Fed. Cir. 2021) (citing Blue & Gold, Fleet, L.P. v. United States, 492 F.3d at 1313)); Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016); Toota Grp., LLC v. United States, No. 25-1956, 2026 WL 1971080, at *11 (Fed. Cl. June 24, 2026); Revelations Counseling & Consulting, LLC v. United States, 180 Fed. Cl. 721, 740 (2026); Telesto Grp., LLC v. United States, 176 Fed. Cl. 711, 740 (2025); Trace Sys. Inc. v. United States, 165 Fed. Cl. 44, 62 (2023); Eagle Techs., Inc. v. United States, 163 Fed. Cl. 692, 706 (2022), appeal dismissed, No. 2023-1473, 2023 WL 2820095 (Fed. Cir. Apr. 7, 2023); Land Shark Shredding, LLC v. United States, 142 Fed. Cl. 301, 311 (2019); MSC Indus. Direct Co. v. United States, 140 Fed. Cl. at 641; Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in Blue and Gold Fleet thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (alteration added) (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original; alteration added).

The Federal Circuit also explained in Blue & Gold:

> "It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005)).

Furthermore, as described above, a "solicitation is ambiguous only if its language is susceptible to more than one reasonable interpretation," and "[i]f the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; we may not resort to extrinsic evidence to interpret them." Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (alteration added); see also Per Aarsleff A/S v. United States, 829 F.3d at 1309; AccelGov, LLC v. United States, 170 Fed. Cl. 508, 516 (2024);(citing Banknote Corp. of Am. v. United States, 365 F.3d at 1353).

The court in Blue & Gold Fleet found that "'[t]he doctrine of patent ambiguity is an exception to the general rule of contra proferentem, which courts use to construe ambiguities against the drafter.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1342 (Fed. Cir. 2004)); see also HPI/GSA 3C, LLC v. United States, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("The general rule is contra proferentem, which requires ambiguities in a document to be resolved against the drafter."); Triax Pac., Inc. v. West, 130 F.3d 1469, 1475 (Fed. Cir. 1997) ("More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of contra proferentem."); Ekagra Partners, LLC v. United States, 163 Fed. Cl. 189, 208 (2022); T.W. Laquay Marine, LLC v. United States, 127 Fed. Cl. 748, 762 (2016) ("A latent ambiguity should be construed against the Government in accordance with the recognized contract interpretation principle of contra proferentum [sic]." (alteration added)).

According to the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision . . . . the provision should be construed less favorably to that party which selected the contractual language." United States v. Seckinger, 397 U.S. 203, 216, reh'g denied, 397 U.S. 1031 (1970) (omission added). This doctrine of contra proferentem "'pushes the drafters toward improving contractual forms and it saves contractors from hidden traps not of their own making.'" Fry Commc'ns, Inc. v. United States, 22 Cl. Ct. 497, 503 (1991) (quoting Sturm v. United States, 190 Ct. Cl. 691, 697, 421 F.2d 723, 727 (1970)). Similarly, according to the United States Court of Appeals for the Federal Circuit: "When a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of contra proferentem, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (citing United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed. Cir. 1987)); see also States Roofing Corp. v. Winter, 587 F.3d 1364, 1372 (Fed. Cir. 2009); Gardiner, Kamya & Assocs. v. Jackson, 467 F.3d 1348, 1352 (Fed. Cir. 2006); HPI/GSA-3C, LLC v. Perry, 364 F.3d 1327, 1334 (Fed. Cir. 2004).

The Federal Circuit in Blue & Gold Fleet further held that "[u]nder the doctrine, where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government." Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (alteration added) (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381 (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))); see also Premier Off. Complex of

Parma, LLC v. United States, 134 Fed. Cl. 83, 88 (2017) ("A patent ambiguity is one that is 'obvious, gross, [or] glaring.'" (alteration in original) (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671, 204 Ct. Cl. 696, 716 (1974))); West Bay Builders, Inc. v. United States, 85 Fed. Cl. 1, 15 (2008) ("A patent ambiguity is one that is obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start.") (alteration in original; internal quotation marks omitted).

In defendant's motion to dismiss, defendant argues:

> 22nd Century's claim that DISA did not direct Menlo to offer the same price to all offerors and thus did not create an even playing field is fundamentally a challenge to the plain terms of the RFP. By failing to raise this challenge prior to the close of bidding on April 20, 2026, 22nd Century has waived its right to make this challenge now.

Intervenor argues in its motion to dismiss:

> Without a Solicitation term mandating equal pricing from Menlo, it was an inherent and obvious possibility that Menlo might quote different prices to different offerors. Plaintiff's post-award arguments about how the Agency should have "establish[ed] guardrails with Menlo, or exercis[ed] any oversight over supplier pricing," are arguments Plaintiff should have raised prior to submitting its proposal if it found the obvious possibility of different supplier pricing objectionable.

(alterations in original; internal references omitted). Protestor responds that "[t]he Court should deny the motions to dismiss because this is not a solicitation protest, but a protest challenging DISA's unreasonable inaction." (alteration added). Protestor adds that "nothing in the Solicitation indicated that DISA planned to cede source selection authority to its mandatory subcontractor by allowing it to pick the winner simply by offering different prices for required products." Protestor also contends that

> our point was never that DISA should have "direct[ed] Menlo to offer the same price to all offerors." Instead, 22nd Century insisted that DISA "ceded source selection authority to Menlo and violated principles of fundamental fairness" when it "[made] Menlo a 'required subcontractor' and fail[ed] to establish guardrails or provide oversight to ensure it treated all bidders fairly." There are plenty of things DISA could have done to ensure fairness. Directing Menlo to offer everyone comparable pricing is certainly one of those things—but far from the only thing. The point is that DISA did absolutely nothing.

(alterations in original; internal references omitted).

Additionally, defendant argues that "by contesting the pricing, 22nd Century is merely mounting a challenge to the terms of the solicitation—a challenge that 22nd

Century has waived by failing to raise it before bidding closed." Protestor responds that "[t]his is not a solicitation protest but a timely challenge to DISA's unreasonable conduct." (alteration added). The court finds that there was not a patent ambiguity in the language of the Solicitation regarding pricing. As quoted above, in Blue & Gold, the United States Court of Appeals for the Federal Circuit has held "where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government." Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381). It is not clear from the Solicitation whether Menlo would offer different prices to different offerors, or that DISA approved of different pricing to different offerors. Defendant noted that "offerors were not prohibited from holding discussions or negotiating with Menlo." Defendant argues: "Although this statement [that offerors were not prohibited from negotiating with Menlo] was not in the RFP, the agency made this clarification in response to offeror questions and attached the answers to an RFP amendment. So offerors were on notice that Menlo was not restricted in its pricing, and that each offeror could engage Menlo in negotiations." (alteration added; internal reference omitted). The court notes that question defendant references was not referencing pricing, but asked: "Can the Government provide reference architectures for the MSCB cloud instances (both GCP and AWS)?" and the government's full answer stated: "No; however, vendors are not prohibited from discussions with Menlo Security," again, without reference to pricing. None of the other questions and answers contemplate the possibility that Menlo would offer different prices to different offerors. The one answer in the questions and answers in the RFP alone does not demonstrate there was a patent ambiguity in the Solicitation.

Furthermore, the Solicitation's evaluation factor summary for "Factor 2: Price," does not demonstrate a patent ambiguity in the Soliication regarding the use of Menlo's pricing in an offeror's proposal. For "Factor 2: Price," the Solicitation stated:

> The Offeror's firm-fixed price proposal will be evaluated for award purposes based upon the total evaluated price which consists of the offeror's proposed prices for the base period, all option periods, including option pricing for an additional 6-month period that may be authorized IAW [in accordance with] FAR 52.217-8, and surge pricing. Evaluation of the options shall not obligate the Government to exercise such options. The offeror's price proposal will be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete. Normally, price reasonableness is established through cost and price analysis techniques as described in FAR 15.404. For a price to be complete, all solicitation requirements must be priced, figures correctly calculated and prices presented in in a clear and useful format. The Government reserves the right, but is not obligated, to conduct a realism analysis.

(alteration added). The pricing information and reference to Menlo in the Solicitation, and the questions and answers provided to the offerors, do not demonstrate that the pricing

offered by Menlo would be different between offerors, and, therefore, does not rise to the level of a patent ambiguity in the Solicitation, because such pricing differences was not obvious from the face of the Solicitation as required in a Blue & Gold analysis. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Oak Grove Techs., LLC v. United States, 116 F.4th at 1378 ("The applicability of the 'Blue & Gold rule' turns on the existence of a patent error."); M.R. Pittman Grp. v. United States, 68 F.4th at 1283 ("Blue & Gold requires that a party with the opportunity to object to the terms of a government solicitation containing a patent error must do so prior to the close of the bidding process or else it waives its ability to raise that objection in the Court of Federal Claims." (citing Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313)).

The court notes that intervenor separately argues that "[t]he Court should dismiss the protest for lack of jurisdiction because Plaintiff's complaints are about the alleged actions of a third party and not about any procurement errors of the Government." (alteration added). Intervenor continues: "Although Plaintiff couches its argument as objection to ***DISA's*** alleged failure to make sure the procurement was fair, the allegedly unfair actions Plaintiff complains about are all the alleged actions of a ***supplier*** that is not even a party to this suit." (all emphasis in original). In response, protestor argues that

> 22nd Century's protest challenges DISA's award to By Light after failing to ensure fundamental fairness and giving Menlo source selection authority it should never have had. It is certainly true that 22nd Century's protest takes issue with Menlo's actions. But they are relevant only because DISA made them relevant. DISA made Menlo the "mandatory subcontractor." DISA structured this as an LPTA [Lowest Price Technically Acceptable] procurement. DISA based its IGCE on Menlo's costs and knew they would make up nearly [redacted]% of the proposed prices As 22nd Century's earlier briefing explained, DISA has the obligation to ensure fundamental fairness in every procurement and had to do that here under the conditions and ground rules it created. This protest asks the Court to judge DISA's unreasonable actions and inactions, not Menlo's. The Court has jurisdiction.

(alteration added; internal references omitted).

Although protestor expresses frustration that Menlo offered different pricing to different offerors, protestor's challenge is lodged against the award by the federal agency and not against Menlo. The amended complaint sole count states: "Count One - DISA did not ensure that this procurement was conducted fairly," and alleges "DISA essentially abdicated its source selection decision in this LPTA procurement to its mandatory subcontractor, Menlo. And, in doing so, frustrated the Source Selection Plan by allowing Menlo's charges to each bidder—not the contractor-provided services—to become the competitive difference." Pursuant to the Tucker Act, this court has jurisdiction over bid protest complaints challenging "the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," by a federal agency. See 28 U.S.C. § 1491(b)(1) (2024). This court, therefore, has jurisdiction over protestor's complaint. Defendant and intervenor's motions to dismiss are denied.

Cross-Motions for Judgment on the Administrative Record

In addition to the motions to dismiss filed by the defendant and the intervenor, the parties have filed cross-motions for judgment on the Administrative Record. As explained by the United States Court of Appeals for the Federal Circuit:

> Cross-motions for judgment on the administrative record are governed by Rule 52.1(c) of the Rules of the United States Court of Federal Claims. "In deciding these motions, the [Claims Court] considers 'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record.'"

XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (alteration in original) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006))); see also Steel Point Sols., LLC v. United States, 180 Fed. Cl. 463, 470 (2026); Advantaged Sols., Inc. v. United States, 179 Fed. Cl. 801, 808 (2026); DigiFlight, Inc. v. United States, 165 Fed. Cl. 588, 598 (2023); Raj v. United States, 158 Fed. Cl. 569, 571 (2022); Superior Optical Labs, Inc. v. United States, 150 Fed. Cl. 681, 691 (2020) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005)); Glocoms, Inc. v. United States, 149 Fed. Cl. 725, 731 (2020); AAR Mfg., Inc. v. United States, 149 Fed. Cl. 514, 522 (2020); Centerra Grp., LLC v. United States, 138 Fed. Cl. 407, 412 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1356–57); Informatics Applications Grp., Inc. v. United States, 132 Fed. Cl. 519, 524 (2017) (citation omitted); Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016), aff'd, 711 F. App'x 651 (Fed. Cir. 2018); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); see also CeleraPro, LLC v. United States, 168 Fed. Cl. 408, 425 (2023); CR/ZWS LLC v. United States, 138 Fed. Cl. 212, 223 (2018) (citing Bannum, Inc. v. United States, 404 F.3d at 1353–54).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under APA standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d at 1309 ("Protests of agency procurement

decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (citing PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010))); Safeguard Base Operations, LLC v. United States, 989 F.3d 1326, 1343 (Fed. Cir. 2021); Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332; Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); DigiFlight, Inc. v. United States, 165 Fed. Cl. at 597. In Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345 (Fed. Cir. 2004), the Federal Circuit explained that "[u]nder the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" Id. at 1351 (alteration added) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); see also Mitchco Int'l, Inc. v. United States, 26 F.4th 1373, 1377 (Fed. Cir. 2022); Harmonia Holdings Grp., LLC v. United States, 999 F.3d 1397, 1403 (Fed. Cir. 2021); Palantir USG, Inc. v. United States, 904 F.3d at 990; AgustaWestland N. Am., Inc. v. United States, 880 F.3d 1326, 1332 (Fed. Cir. 2018); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Toota Grp., LLC v. United States, 2026 WL 1971080, at *12 ("Judicial review of agency action under the APA typically proceeds on two tracks; the Court could find: (1) the agency's decision lacked either a rational basis or support from the administrative record or was arbitrary and capricious; and/or (2) the agency's procurement procedure involved a violation of regulation or statute.").

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d at 1363 ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (alterations in original) (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)))). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D)

(2024);[4] see also REV, LLC v. United States, 91 F.4th 1156, 1163 (Fed. Cir. 2024); Sys. Stud. & Simulation, Inc. v. United States, 22 F.4th 994, 997 (Fed. Cir. 2021); Veterans Cont. Grp., Inc. v. United States, 920 F.3d 801, 806 (Fed. Cir. 2019) ("In a bid protest, we follow Administrative Procedure Act § 706 and set aside agency action 'if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting Palladian Partners, Inc. v. United States, 783 F.3d 1243, 1252 (Fed. Cir. 2015)); Per Aarsleff A/S v. United States, 829 F.3d at 1309; Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); and Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom.

---

[4] The language of 5 U.S.C. § 706 provides in full:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (first alteration added) (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000)." (internal citations omitted)); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Seabee Constr., Inc. v. United States, 182 Fed. Cl. 75, 84 (2026); Toota Grp., LLC v. United States, 2026 WL 1971080, at *12; Synergy Sols., Inc. v. United States, 133 Fed. Cl. 716, 734 (2017) (citing Banknote Corp. of Am. v. United States, 365 F.3d at 1350); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Cont., Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d at 1351), reh'g en banc denied (Fed. Cir. 2011); see also Off. Design Grp. v. United States, 951 F.3d 1366, 1371 (Fed. Cir. 2020); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure." (alteration added) (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86)); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); Connected Glob. Sols., LLC v. United States, 162 Fed. Cl. 720, 732 (2022).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (alteration added) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002)

("[T]he agency tribunal must present a full and reasoned explanation of its decision . . . . The reviewing court is thus enabled to perform meaningful review . . . ." (alteration and omissions added)). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990) (citing Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 524 (1978)).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Dell Fed. Sys., L.P. v. United States, 906 F.3d at 990; Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)); Synergy Sols., Inc. v. United States, 133 Fed. Cl. at 735 (citing Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332–33). ""'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'"" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Limco Airepair, Inc. v. United States, 130 Fed. Cl. 544, 550 (2017) (citation omitted). Stated otherwise by the United States Supreme Court:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (internal citations omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); DynCorp Int'l, LLC v. United States, 10 F.4th 1300, 1315 (Fed. Cir. 2021) ("Review in bid protests under the arbitrary-and-capricious standard is 'highly deferential.' Under it, we must 'sustain an agency action evincing rational reasoning and consideration of relevant factors.'" (internal citations omitted)); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" standard, the Federal Circuit stated "'the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.'" (quoting Tex. Crushed Stone Co. v. United States,

35 F.3d 1535, 1540 (Fed. Cir. 1994))); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); Sys. Studies & Simulation, Inc. v. United States, 146 Fed. Cl. 186, 199 (2019); By Light Prof'l IT Servs., Inc. v. United States, 131 Fed. Cl. 358, 366 (2017); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (internal citations omitted) (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004); and Axiom Res. Mgmt. v. United States, 564 F.3d at 1381)), appeal dismissed, 559 F. App'x 1033 (Fed. Cir. 2014); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012).

As reflected above, in the above captioned protest, protestor argues that "[b]y making Menlo a 'required subcontractor' and failing to establish guardrails or provide oversight to ensure it treated all bidders fairly, DISA essentially ceded source selection authority to Menlo and violated principals of fundamental fairness." (alteration added). Additionally, plaintiff contends:

> While it may be true that DISA made the award, Menlo certainly picked the winner. DISA made Menlo a mandatory subcontractor, knowing its costs would make up nearly [redacted]% of the proposed price. Yet DISA did nothing to ensure Menlo treated bidders fairly. That meant Menlo had the unimpeded ability to pick the winner in this LPTA procurement by giving it a better deal than the other bidders.

In response, defendant argues that "the record does not show that DISA treated offerors unfairly or ceded control of the procurement to Menlo. DISA established the same solicitation requirements for all offerors, allowed offerors to negotiate with Menlo, evaluated all proposals under the same criteria, and made the final award decision itself." Additionally, defendant contends that "other than the fact that Menlo apparently did not give 22nd Century as good a deal as it gave to By Light, 22nd Century cannot point to any evidence in the record to demonstrate that DISA did not treat all offerors fairly and impartially."[5]

---

[5] At oral argument, counsel for protestor argued that "[f]or 22nd Century, we have the Menlo quote. So we know that Menlo gave -- and [redacted] and [redacted] are exactly -- or, excuse me, [redacted] and 22nd Century, exactly the same; [redacted] within a few million dollars," and argued Menlo's price to By Light was more than $[redacted] less. (alteration added).

The Solicitation "Basis for Contract Award" explained that "[a]ward will be made to the responsible offeror whose proposal is determined to represent the overall best value to the Government using a lowest price technically acceptable (LPTA) evaluation process. The Government anticipates awarding to the lowest price technically acceptable respondent . . . ." (alteration and omission added). The Solicitation's two evaluation factors were Factor 1, "Technical/Management Approach," and Factor 2, "Price." According to the Solicitation: "The Technical/Management subfactors will be evaluated and rated either Acceptable or Unacceptable. In order for a proposal to be rated overall Technically Acceptable, each of the subfactors must be rated Acceptable." As described above, for "Factor 2: Price," the Solicitation stated:

> The Offeror's firm-fixed price proposal will be evaluated for award purposes based upon the total evaluated price which consists of the offeror's proposed prices for the base period, all option periods, including option pricing for an additional 6-month period that may be authorized IAW [in accordance with] FAR 52.217-8, and surge pricing. Evaluation of the options shall not obligate the Government to exercise such options. The offeror's price proposal will be evaluated, using one or more of the techniques defined in FAR 15.404, in order to determine if it is reasonable and complete. Normally, price reasonableness is established through cost and price analysis techniques as described in FAR 15.404. For a price to be complete, all solicitation requirements must be priced, figures correctly calculated and prices presented in in a clear and useful format. The Government reserves the right, but is not obligated, to conduct a realism analysis.

(alteration added). As emphasized by the defendant in its submissions, and re-iterated by intervenor's counsel at oral argument, the agency was not required under the terms of the Solicitation to conduct a price realism analysis, and did not, in fact, conduct a price realism analysis during its evaluation of the offerors' proposals.

In the April 27, 2026 Source Selection Decision Document, the Source Selection Authority explained: "After initial evaluation of the offerors, the Government conducted discussions with all offerors and requested Final Proposal Revisions (FPRs) from the four offerors," and the Source Selection Evaluation Team "determined all offerors were technically acceptable with conclusion of the oral proposal presentations." Regarding Price, the Source Selection Authority explained:

> All offerors' prices were evaluated and determined to be complete and reasonable. The Contracting Officer determined that price competition existed and I concur. Price realism analysis was not performed. The price evaluation was based on the TEPs [Total Evaluated Prices] compared to the IGCE and proposed average price for the projected 5-year contract life (one-year base period and four, 1-year options). The TEP consisted of the offeror's proposed prices for the base period, all option periods, and option

> pricing for an additional 6-month extension period that may be authorized IAW FAR 52.217-8.

(alteration added). The record reflects that in response to the Solicitation, the four offerors submitted price proposals which ranged from $[redacted] to $[redacted]. After Amendment 0004 was issued, the parties submitted revised pricing ranging from $[redacted] to $[redacted]. Subsequently, the four offerors submitted final revised proposals, which included revised price proposals. The final prices were: $344,654,988.32 for intervenor By Light, $[redacted] for protestor 22nd Century, $[redacted], and for [redacted]. The April 27, 2026 Source Selection Decision Document explained:

> By Light's TEP is $[redacted], which is the lowest of the four offerors. By Light is [redacted]% lower than the next lowest offeror, and [redacted]% lower than the average total proposed prices of all offerors, which is $[redacted]. Further, the TEP compares favorably to the IGCE and is [redacted]% higher than the IGCE amount of $[redacted] (including six-month extension). Although higher, By Light's TEP is still within a reasonable range of the IGCE. A reasonable range is considered to be within 1 standard deviation. In a normal distribution, 1 standard deviation will include the data that is within [redacted]% of the average. By Light is considered reasonable in comparison to the IGCE.

Therefore, the Source Selection Authority concluded: "Although no competitive range was determined to exclude any offerors, the evaluation of offerors, after receipt of FPRs [Final Proposal Revisions], clearly shows By Light is the LPTA [Lowest Price Technically Acceptable] offeror. Accordingly, I direct the Contracting Officer to award the CBII contract to By Light." (alterations added).

The agency evaluated all the offerors' proposals for technical acceptability and, if acceptable, for each remaining, acceptable offeror, determined the lowest price. After evaluation, DISA determined that the acceptable offeror with the lowest price was By Light. Protestor repeatedly suggests that the agency knew, or should have known, that Menlo was charging different prices to the offerors and that was fundamentally unfair, arguing:

> DISA knew or should have known that By Light got a sweetheart deal. Had DISA backed out By Light's staffing costs from its final price, just as it did before, it would have seen that Menlo charged By Light no more than $[redacted]. Comparing that to [redacted] proposal, DISA would have known that Menlo charged [redacted] $[redacted] more for the same thing. That should have tipped DISA off to the fundamental fairness problems that plagued this procurement.

(footnote and internal reference omitted). Although raising issues of unfairness, protestor has not demonstrated that the agency did, in fact, know that Menlo was charging different

prices to different offerors. The offerors were not required to break out their pricing for the Menlo subscriptions in the proposal to the agency and three of the four offerors, including protestor, did not break out the Menlo information in their proposals.[6] Furthermore, although protestor repeatedly suggested that the agency could "back out" the information, it is not evident from the Administrative Record that the agency performed that analysis on the final price proposals. At oral argument, protestor suggested that it was "an analysis they [DISA] were already doing and had done." (alteration added). Protestor's counsel, however, conceded that the analysis was "on an earlier version of the proposal, but then they carried that number over to the most recent evaluation." As noted above, the agency only completed a price reasonableness analysis, and not a price realism analysis, and, therefore, it was not apparent that the agency necessarily would have concluded different prices were charged by Menlo to the multiple offerors.[7] Additionally, the different prices are not reflected in the April 27, 2026 Source Selection Decision Document.[8]

At the oral argument in the above captioned protest, the defendant represented to the court that the agency did not know the Menlo was charging different prices to the different offerors. At oral argument, the court had the following exchange with defendant's counsel of record:

> The Court: Did the contracting officer know that there were not the same prices offered to offerors to the proposal?
>
> Ms. Meyer [defendant's counsel of record] No. I mean --
>
> The Court: Why are we hedging here? It's a pretty simple question.
>
> Ms. Meyer: Yeah, because the contracting officer knew that the pricing was different for each offeror for the licenses.

---

[6] As explained in the protestor's motion for judgment on the Administrative Record, "[redacted] proposal showed DISA exactly what Menlo charged—$[redacted] for one year of Menlo's CBII Managed Service agreements and $[redacted] for a one-year license for Menlo's HEAT Shield product in the base year."

[7] As explained by intervenor's counsel at oral argument:

> They [DISA] didn't do price realism, they didn't have to do price realism. And so if there had been a price realism analysis, you can imagine the Government thinking, oh, okay, there's a reason that By Light's price is a little bit lower because there's a preexisting relationship. You can imagine that that analysis might have happened, but it didn't need to happen here.

[8] The court also notes that By Light's final price was more than $[redacted] higher than the revised Independent Government Cost Estimate. Given that By Light's price was higher than the Independent Government Cost Estimate, it would not have raised immediate concerns at the agency that By Light's price was too low.

The Court: Knew that or just knew that the ultimate prices were different?

Ms. Meyer: Knew that the ultimate prices were different.

The Court: Did they know that there were different licensing numbers given to offerors to the proposal?

Ms. Meyer: No, there's nothing in the record that would show that the contracting officer knew that. And the contracting officer -- or the final price evaluation, the agency looked at the pricing – the final pricing. So it found that By Light's price was 6 percent --

The Court: So you're an officer of the Court. Have you asked your contracting officer that question?

Ms. Meyer: I did not ask the contracting officer that question, no.

The Court: You think that would have been an appropriate question?

Ms. Meyer: Yes, Your Honor, and I'm happy to ask her that question.

The Court: Go right ahead.

Ms. Meyer: Okay.

(Counsel conferring with contracting officer.)

Ms. Meyer: The contracting officer represents to the Court, through me, that she did not know that there were different prices charged by Menlo.

The Court: To each of the offerors?

Ms. Meyer: To each of the offerors.

(alteration added). Given that the agency appears from the record to have been unaware that different prices were being charged by Menlo, and given that the agency indicated it did not, and was not required to, preform a price realism analysis, the court finds that the agency did not act arbitrarily or capriciously in finding that By Light was the lowest price technically acceptable offeror when awarding the contract to By Light. See Safeguard Base Operations, LLC v. United States, 989 F.3d at 1343; Dell Fed. Sys., L.P. v. United States, 906 F.3d at 990; Per Aarsleff A/S v. United States, 829 F.3d at 1309. The agency evaluated all offerors, including from protestor and intervenor, under the same terms and factors in the Solicitation, and concluded, after evaluation, that By Light was lowest price, technically acceptable offeror. It also is not clear that the protestor could succeed on the merits of its claim even if DISA was aware of the price discrepancy. Although the court

concludes that it was not a patent ambiguity that Menlo could charge different prices to different offerors, the Solicitation also did not require that Menlo provide the same price to each offeror under the terms of the Solicitation. It, therefore, remained a possibility under the Solicitation that Menlo could charge different prices to different offerors without violating the terms of the Solicitation. Although protestor is frustrated by the actions of Menlo, Menlo was not required to provide protestor with the same exact pricing as Menlo provided By Light. Moreover, protestor cannot sufficiently demonstrate that the different prices charged to Menlo meant that "Menlo certainly picked the winner," given the unrelated technical evaluation conducted on each offeror's proposal. The letter of the law and best practices are not always the same.

Motion to Supplement

As described above, protestor also filed a motion to supplement the Administrative Record, which defendant and intervenor opposed. Protestor seeks to add a declaration from [redacted], who is 22nd Century's [redacted], in which protestor claims it "provided details about 22nd Century's efforts to negotiate a lower subscription price with Menlo," and a declaration from Brad English, who is 22nd Century's attorney of record in the above captioned protest, which protestor claims allegedly described the price Menlo provided to By Light.

The United States Supreme Court has held that when "reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." Dep't of Com. v. N.Y., 588 U.S. 752, 780 (2019) (citing Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. at 549 (calling the United States Supreme Court's establishment of this principle "abundantly clear") and Camp v. Pitts, 411 U.S. 138, 142–43 (1973)). The United States Court of Appeals for the Federal Circuit in Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, provides the following test for supplementing the administrative record:

> The focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA. Faced with the request to supplement the administrative record in this case, the Court of Federal Claims should have determined whether supplementation of the record was necessary in order not "to frustrate effective judicial review."

Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381 (quoting Camp v. Pitts, 411 U.S. at 142–43) (emphasis added). The Federal Circuit in Axiom also characterized the test as "supplementation of the record should be limited to cases in which 'the omission of extra-record evidence precludes effective judicial review.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000), aff'd, 398 F.3d 1342 (Fed. Cir. 2005)); see also Kayhan Space Corp. v. United States, 181 Fed. Cl. 659, 692 (2026); Insight Pub. Sector, Inc. v. United States, 157 Fed. Cl. 398, 406 (2021). As explained by another Judge of the United States Court of Federal Claims: "Supplementation of the administrative record 'should be limited to cases in which

the omission of extra-record evidence precludes effective judicial review,' id. [Axiom Res. Mgmt., Inc. v. United States, 564 F.3d] at 1380 (cleaned up), because 'the focal point for judicial review [under the APA] should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Aery Aviation, LLC v. United States, 179 Fed. Cl. 392, 407 (2025) (quoting Camp v. Pitts, 411 U.S. at 142) (first alteration added). As described by another Judge of the United States Court of Federal Claims: "The administrative record in an APA case (or, as here, a case applying APA review) consists of 'all documents and materials that the agency directly or indirectly considered.'" CAN Softtech, Inc. v. United States, 173 Fed. Cl. 480, 485, recons. denied, 174 Fed. Cl. 412 (2024) (quoting Safari Club Int'l v. Jewell, 111 F. Supp. 3d 1, 4 (D.D.C. 2015); see also Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 342 (1997) (citing Camp v. Pitts, 411 U.S. at 142) ("The court's inquiry is therefore based on an examination of the 'whole record' before the agency; that is, all the material that was developed and considered by the agency in making its decision.").

Defendant argues that "[t]he extra-record declarations and exhibits 22nd Century submitted were not before the contracting officer, are not necessary for effective judicial review, and largely seek to introduce post-award information about private negotiations between 22nd Century and Menlo." (alteration added). Also as represented by defendant's counsel at the oral argument, and confirmed by the contracting officer, the agency apparently was not aware that Menlo had charged different prices to different offerors. The court agrees that the information in both declarations and exhibits attached thereto were not before the agency when the South Selection Authority made a decision to award the contract to By Light. As the documents by which protestor seeks to supplement the record were not relied upon by the agency during the Solicitation and selection process, the omission of the counsel's declaration, 22nd Century's [redacted] declaration and the exhibits do not preclude effective judicial review. See Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381. The declarations and exhibits, therefore, which are not part of the Administrative Record, were not considered by the court when considering the parties' cross-motions for judgment on the Administrative Record.

## CONCLUSION

Defendant's and intervenor's motions to dismiss protestor's complaint are **DENIED**. Protestor's motion for judgment on the Administrative Record is **DENIED**. Protestor's motion to supplement the Administrative Record is **DENIED.** Defendant's and intervenor's cross-motions for judgment on the Administrative Record are **GRANTED**. The Clerk's Office shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**